**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

LUIGI B.,

                Claimant,

       v.

ANDREW SAUL, Commissioner
of Social Security,

                Respondent.

No. 18 CV 7392

Magistrate Judge Jeffrey T. Gilbert

## MEMORANDUM OPINION AND ORDER

Claimant Luigi B.[1] ("Claimant") seeks review of the final decision of Respondent Andrew Saul,[2] Commissioner of Social Security ("Commissioner"), denying Claimant's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). Pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, the parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings, including entry of final judgment. [ECF No. 6]. The parties have filed cross-motions for summary judgment [ECF Nos. 17, 24] pursuant to Federal Rule of Civil Procedure 56. This Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c). For the reasons discussed below, Claimant's Motion for Summary Judgment [ECF No. 17] is denied, and the Commissioner's Motion [ECF No. 24] is granted.

---

[1] Pursuant to Northern District of Illinois Local Rule 8.1 and Internal Operating Procedure 22, the Court will identify the non-government party by using his or her full first name and the first initial of the last name.

[2] Andrew Saul was sworn in as Commissioner of Social Security on June 17, 2019. Pursuant to Federal Rule of Civil Procedure 25(d), the Court has substituted Commissioner Saul as the named defendant.

## PROCEDURAL HISTORY

On November 16, 2010, Claimant filed a Title II application for DIB alleging disability beginning on August 25, 2008.[3] (R. 120-23). His claim was denied initially and upon reconsideration, after which Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (R. 28-49). On August 21, 2012, Claimant appeared and testified at a hearing before ALJ Janice Bruning, who presided over the hearing by videoconference. (R. 35-70). ALJ Bruning also heard testimony on that date from vocational expert ("VE") Thomas Dunleavy. (R. 35-70). On November 2, 2012, ALJ Bruning denied Claimant's claim for DIB. (R. 17-34). Claimant petitioned the Northern District of Illinois for judicial review on May 12, 2014, (R. 602-03), and on January 26, 2015, Magistrate Judge Sheila Finnegan granted the parties' agreed motion for reversal with remand so that the ALJ may "update the medical record; further evaluate Plaintiff's residual functional capacity with specific consideration of the non-examining source opinion in Exhibit 4F; if necessary, obtain vocational expert testimony; offer Plaintiff the opportunity for a new hearing; and issue a new decision." (R. 607, 612). The Appeals Council subsequently vacated the November 2, 2012 decision and remanded the case with further instructions. (R. 615-617). Another hearing was conducted on September 16, 2015 before ALJ William Spalo, at which both Claimant and VE Dunleavy again testified (R. 549-600). On October 16, 2015, ALJ Spalo denied Claimant's claim for DIB after considering his limitations. (R. 526-542).

In finding Claimant not disabled, the ALJ followed the five-step evaluation process required by Social Security regulations for individuals over the age of 18. See 20 C.F.R. § 416.920(a). At step one, the ALJ found that Claimant did not engage in substantial gainful activity

---

[3] Claimant had previously filed an application for DIB on August 28, 2008, which was denied at every stage and memorialized in an opinion by a different administrative law judge on October 29, 2010. (R. 17-34).

during the relevant period from October 30, 2010 through his date last insured of December 31, 2013.[4] (R. 532).

At step two, the ALJ found that Claimant had a severe impairment or combination of impairments as defined by 20 C.F.R. 404.1520(c) and 416.920(c). (R. 532-34). Specifically, Claimant suffered from status post history of multiple abdominal surgeries, a left rotator cuff tear, right shoulder impingement, arthritis of the right thumb, status post history of reconstructive right wrist surgery with residual pain complaints, and status post right carpal tunnel syndrome surgery and deQuervain's release (20 CFR 404.1520(c)). (R. 532). The above-noted severe impairments, according to the ALJ, limit Claimant's ability to perform the full range of basic work activities. (R. 532). The ALJ also acknowledged several non-severe complaints – a medical history of diverticulitis, mild degenerative changes to Claimant's right knee, and depression – and concluded that although they did not rise to the level of severe impairments, he would nevertheless address or incorporate Claimant's limitations from each of these areas into the RFC, if appropriate. (R. 533-35).

At step three, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 535). The ALJ noted that Claimant did not meet or medically equal the criteria of listing 1.02, the applicable listing for major dysfunction of a joint, for several reasons. First, the ALJ noted that the results of a consultative exam showed that Claimant's joint-related impairments did not result in the inability to ambulate effectively. Second,

---

[4] Consistent with direction from the Appeals Council, the ALJ reconsidered the specific period at issue and determined that as a result of a binding decision by another administrative law judge dated October 29, 2010, the relevant period for his consideration was from October 30, 2010 through the date last insured, December 31, 2013. (R. 529-30). Claimant agrees that this accurately captures the relevant period at issue. Plaintiff's Memorandum [ECF No. 17] at 5 ("The ALJ correctly determined the relevant period before him, due to a previous filing, was from 10/30/10 through the date of last insured of 12/31/13 (530).")

Claimant was able to perform fine and gross manipulative maneuvers and had only mild difficulty with some tasks. (R. 534). Based on the diagnostic testing and clinical examination findings in the record, the ALJ concluded that there were insufficient objective findings to support a listing level condition. (R. 534). In particular, the ALJ noted that no treating or examining physician identified findings equivalent in severity to the criteria of any listed impairment, nor did the evidence, from the ALJ's perspective, show medical findings that were the same or equivalent to those of any listed impairment. (R. 535).

The ALJ then found Claimant had the RFC,[5] through Claimant's date last insured, to:

> "perform light work as defined in 20 CFR 404.1567(b) except the claimant was unable to climb ladders, ropes or scaffolds; he was able to occasionally crawl and climb ramps and stairs; he was able to frequently kneel, crouch, stoop and balance; he was able to occasionally reach to the front and the side with the right dominant upper extremity; he was unable to reach overhead bilaterally; he was able to occasionally handle and finger with the right dominant upper extremity." (R. 535).

Based on this RFC, the ALJ found at step four that Claimant had past relevant work as a restaurant cook, but that he was unable to perform this work, as it was medium in exertional demand and Claimant was limited to light work with some additional restrictions. (R. 541). At step five, the ALJ concluded that, considering Claimant's age, education, past work experience, and residual functional capacity, he is capable of performing other work within the national economy and that those jobs exist in significant numbers. (R. 541-42). Specifically, the VE's testimony, on which the ALJ relied, identified jobs including usher, sales attendant, and cashier, as those that would be available to Claimant in significant numbers. (R. 542). The ALJ then found Claimant was not disabled under the Act. (R. 542). The Appeals Council declined to review the matter on September 18, 2018, (R. 509-12), making the ALJ's decision the final decision of the

---

[5] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite [her] mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008).

Commissioner and, therefore, reviewable by this Court. 42 U.S.C. § 405(g); *see, e.g., Smith v. Berryhill,* 139 S. Ct. 1765, 1775 (2019); *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## STANDARD OF REVIEW

A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). Judicial review is limited to determining whether the ALJ's decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his or her decision. *See Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

Substantial evidence "means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations omitted); *see also, Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Biestek,* 139 S. Ct. at 1154; *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even where there is adequate evidence in the record to support the decision, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (internal quotations omitted). In other words, if the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008) (internal quotations omitted). The reviewing court may not, however,

"displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

## ANALYSIS

### I.     The ALJ's Opinion was Supported by Substantial Evidence

Claimant argues that substantial evidence does not support the ALJ's conclusion that Claimant can perform other work because the ALJ's formulation of the RFC did not accurately portray or capture his physical and mental impairments. In particular, Claimant argues that the ALJ failed to consider two things. First, Claimant asserts that the ALJ did not adequately consider his mental limitations – namely, the symptoms of his depression – when formulating his RFC. [ECF No. 17] at 5-6. Second, Claimant argues that the ALJ did not properly evaluate whether Claimant's impairments, either individually or in combination, satisfied a severe listing-level impairment other than listing 1.02B, the only listing the ALJ specifically addressed and rejected in his opinion. [ECF No. 17] at 6-8. Because the ALJ specifically considered all the evidence Claimant now says was neglected and supported his decision with substantial evidence, the Court affirms on these two points, as explained below.

### a.  Claimant's Mental Limitations and Symptoms of Depression

Turning first to the contention that substantial evidence did not support the ALJ's conclusion that Claimant's depression was non-severe, Claimant essentially asserts that the ALJ failed to adequately perform both steps of the special technique in 20 C.F.R. § 404.1520a in assessing the severity of Claimant's depression. Had he considered all the evidence and testimony in the record, Claimant seems to argue, the ALJ would necessarily have concluded Claimant's depression constituted a severe impairment. However, because the ALJ "discussed [Claimant's] mental medical history" and considered the four broad functional areas required – activities of

daily living; social functioning; concentration, persistence, and pace; and episodes of decompensation – he properly applied the special technique and appropriately concluded that Claimant's mental impairment was non-severe, as discussed further below.

The special technique in 20 C.F.R. § 404.1520a is used to analyze "whether a claimant has a medically determinable mental impairment and whether that impairment causes functional limitations." *Craft v. Astrue,* 539 F.3d 668, 674 (7th Cir. 2008). It requires an ALJ to first evaluate the claimant's symptoms, 20 C.F.R. § 404.1520a(b)(1), and, if the ALJ finds those symptoms amount to a medically-determinable impairment, to then rate the degree of limitation that the claimant experiences across four areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Id.* § 404.1520a(c)(3). The ALJ must document use of the special technique by incorporating the pertinent findings and conclusions into the written decision and must elaborate on significant medical history. *Id.* § 404.1520a(e)(2). This includes examination and laboratory findings, as well as the functional limitations that were considered in reaching a conclusion about the mental impairment's severity. *Id.* Finally, the decision must also incorporate "a specific finding as to the degree of limitation in each of the functional areas." *Id.*

As required at the first step of the special technique, the ALJ evaluated Claimant's symptoms and signs of depression. He correctly noted that Claimant himself did not allege or describe any mental health impairments or symptoms of depression at the hearing in this case, but instead complained of reduced concentration and focus, moodiness, and irritability secondary to pain as a result of his *physical* impairments and pain-related medication. (R. 532, 558, 581). Nevertheless, the ALJ analyzed Claimant's prior assertion that he suffered from depression and supporting evidence to that effect from a psychiatric consultative examination in 2011. (R. 532-

7

33). On June 23, 2011, Dr. Piyush Buch, M.D. examined Claimant at the request of a state agency consultant and documented complaints from Claimant that "he has depression on and off" and "feels helpless and hopeless at times." (R. 414). Claimant further described "some loss of interest and pleasure in activities," "loss of energy," and a "decreased ability to think and make decisions" to Dr. Buch at that time. (R. 414). The ALJ acknowledged Claimant self-reported these symptoms during the examination and considered Dr. Buch's objective observations of Claimant as well. Claimant made abnormal, slow, and painful movements during the examination, but had good eye contact, gave relevant answers, and made spontaneous conversation. Although Claimant's affect was depressed throughout the interview, Dr. Buch documented – and the ALJ emphasized – that Claimant was nevertheless alert, oriented, and had good attention, concentration, abstract thinking, and social judgment. (R. 415, 533). He related well, had appropriate behavior, and was able to understand, remember, and carry out instructions. Ultimately, Dr. Buch diagnosed Claimant with major depressive disorder, but did not identify any limitation on Claimant's ability to function as a result. (R. 415). The ALJ was correct to consider the above evidence to ascertain whether Claimant's depression amounted to a medically determinable impairment.

At the second step, the ALJ outlined, in great detail, the degree of limitation Claimant experienced in the four broad functional areas at issue. (R. 533-34). He first concluded that Claimant's activities of daily living were not limited and emphasized that any alleged reduction in such activities stemmed, by Claimant's own testimony, not from mental health limitations but physical pain. (R. 533). The ALJ also identified no limitation in social functioning, as Claimant stated at his psychological exam that he socializes with friends, interacts with his family, and occasionally attends church. (R. 415, 533). In the third functional area – concentration, persistence, or pace – the ALJ concluded that Claimant suffered from only a mild limitation. Recognizing that

Dr. Kravtiz, the state agency mental health consultant, opined moderate limitations in this area,[6] (R. 431-33), the ALJ laid out the precise reasons he disagreed with this assessment. (R. 533-35).

In support of his determination, the ALJ explained that Dr. Kravtiz's moderate limitation was based on a one-time psychological consultative exam that did not contain objective evidence supporting significant findings of a mental limitation. (R. 429, 534). According to the record, Claimant never sought or received treatment for a mental health impairment, and other than a depressed affect during Dr. Kravitz's exam, Claimant's mental status functioning, as well as tasks of concentration and short-term memory, were generally intact. (R. 534). The state agency consultant's exam showed no limitations to Claimant's mental functioning, (R. 363-70), and Claimant's 2011 psychological consultative exam echoed this conclusion. (R. 533-34); (R. 415) ("His attention concentration was good and his memory was average. His intelligence was fair and his general knowledge was good…He was able to understand, remember, and carry out instructions."). So too did Dr. Kravtiz document objective observations that Claimant's "[t]asks of concentration and short-term memory were grossly intact." (R. 433). Finally, with respect to the fourth function area of decompensation, Claimant had no treatment, inpatient hospitalizations, or "emergent presentations" of mental health symptoms or distress. (R. 534). Because Claimant's medically determinable impairments caused no more than mild limitation in any of the first three functional areas and no episodes of decompensation of extended duration in the fourth area, the ALJ then concluded Claimant's depression was non-severe.

---

[6] At the end of his brief and almost as an afterthought, Claimant appears to re-argue that the RFC and the hypothetical posed to the VE did not capture all of Claimant's mental limitations. Claimant asserts, without context or support beyond a single sentence, that "the hypothetical poses [sic] to the VE failed to include Dr Kravitz's finding of moderate limitation in circulation [sic] persistence and pace(420) contrary to **Moreno vBerryhill**, supra, at page 730." [ECF No. 17] at 15 (emphasis in original). To the extent Claimant is arguing that Dr. Kravitz's opinion that Claimant had moderate limitations in *concentration,* persistence, or pace should have been presented to the VE, the Court responds to Claimant's argument in this regard in this section of its Memorandum Opinion and Order.

Mere disagreement with the outcome of the ALJ's analysis does not entitle Claimant to reversal, particularly where the ALJ followed the necessary steps of the special technique in 20 C.F.R. § 404.1520a and supported his conclusions with substantial evidence and logical reasoning. As described above, the ALJ thoughtfully addressed Claimant's depression-related symptoms, though he did not assign to them the significance that Claimant would prefer. Yet even had the ALJ agreed with the most severe opinion in the record regarding Claimant's mental limitation – Dr. Kravtiz's opinion that Claimant had a moderate limitation in concentration, persistence, and pace and should therefore be limited to only routine, day-to-day work stressors and simple, routine tasks – this limitation would have likely been captured by Claimant's RFC limiting him to only unskilled work. (R. 534-35). Although this Court is cognizant that restricting a claimant to unskilled work does not always account for a moderate limitation in concentration, persistence, and pace,[7] Claimant does not make that argument here. Nor is it apparent that the record would support such an argument in this case.

Further, even though the ALJ concluded that the ALJ's depression was non-severe, he nevertheless took care to consider its impact and concluded that the RFC he fashioned reflected the mild degree of limitation he found Claimant experienced with concentration, persistence, and

---

[7] The Seventh Circuit has explained that "in most cases employing terms like simple, repetitive tasks on their own" is not enough to account for a claimant's limitations in concentration, persistence, and pace. *Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019). This is because, as the Social Security Administration has itself recognized, the "response to the demands of work is highly individualized," and therefore, "the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job." SSR 85–15. This determination is, however, still to be made on a case-by-case basis, as it is possible that an RFC limited to simple, routine, and repetitive tasks may account for deficits in concentration, persistence, and pace when the record demonstrates that the RFC adequately captures a claimant's mental limitations. *Jozefyk v. Berryhill*, 923 F.3d 492, 495, 497-98 (7th Cir. 2019) (where claimant's impairments only surfaced in social settings, the ALJ did not err in limiting claimant to "simple, routine, repetitive tasks" that required limited-to-no social interaction); *Dudley v. Berryhill*, 773 F. App'x 838, 842 (7th Cir. 2019) (holding limitation to "simple, routine and repetitive tasks" and "work requiring the exercise of only simple judgment" accommodated claimant's stress- and panic-related impairments and concentration difficulties).

pace. (R. 534-35) ("the following residual functional capacity assessment reflects the degree of limitation I have found in the "paragraph B" mental function analysis."); *see* 20 C.F.R. § 404.1545(a)(2), (b), (c) (when determining the RFC, the ALJ must consider all medically determinable impairments, physical and mental, even those that are not considered "severe."). In short, the ALJ supported his conclusion that Claimant did not have any work-related limitations as a result of his non-severe depression with substantial evidence and followed the steps required of him as part of the special technique in 20 C.F.R. § 404.1520a. The ALJ's analysis and conclusion will stand.

### b. Claimant's Physical Limitations and the ALJ's Step Three Analysis

Claimant next asserts that the ALJ erred at step three when he concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of a listing level impairment. In particular, Claimant faults the ALJ for his analysis of listing 1.02B and for not specifically evaluating listing 1.08, which involves soft tissue injuries. Because the ALJ satisfied his burden at step three, and because Claimant fails to provide any meaningful detail or argument about listing 1.08 that would afford a basis for this Court to disturb the ALJ's opinion, Claimant's argument on this point is without merit.

"To determine whether an individual is disabled at step 3, an ALJ must follow 20 C.F.R. § 404.1529(d)(3), which describes how the agency decides whether the individual's impairment or combination of impairments are medically equal in severity to an impairment on the list of pre-determined disabling impairments." *Curvin v. Colvin,* 778 F.3d 645, 650 (7th Cir. 2015). It is Claimant's burden to show not only that his impairments meet a listing, but that his impairments satisfy all of the various criteria specified in the listing. *Maggard v. Apfel,* 167 F.3d 376, 380 (7th Cir. 1999). When evaluating a Claimant's condition and a listed impairment, an ALJ must discuss

the listing by name and offer "more than a perfunctory analysis of the listing." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citing *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2002); *Scott v. Barnhart*, 297 F.3d 589, 595–96 (7th Cir. 2003); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002)). In that vein, while an ALJ has the obligation to consider all relevant medical evidence, he need not mention every piece of evidence, so long he builds a logical bridge from the evidence to his conclusion. *Getch v. Astrue,* 539 F.3d 473, 480 (7th Cir. 2008).

Here, the ALJ's analysis at step three was as follows:

"Although the claimant has 'severe' impairments, his impairments, considered individually and in combination, do not meet the criteria of any listed impairments described in Appendix 1 of the Regulations (20 CFR Part 4, Subpart P Appendix 1). No treating or examining physician has identified findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment. The state agency medical and mental health consultants opined no listing level condition (Exhibits 4F; 10F; 8F; 9F).

I considered listing 1.02 (*major dysfunction of a joint*). The claimant does not have a major dysfunction of a joint that involves one major peripheral weight-bearing joint resulting in an inability to ambulate effectively or involvement of one major peripheral joint in each upper extremity resulting in an inability to perform fine and gross movements effectively. The consultative exam showed the claimant could ambulate effectively. He could perform fine and gross manipulative maneuvers. He only had mild difficulty with some tasks (Exhibit 3F). Throughout this decision, different diagnostic testing and clinical exam[] findings are noted, but they do not support objective findings to support a listing level condition (Exhibits 12F)." (R. 535).

As evidenced above, the ALJ certainly conducted more than a "perfunctory" step three analysis in this case. *Barnett,* 381 F.3d at 668. He identified the listing at issue – 1.02B, which involves the major dysfunction of a joint – and described with particularity why Claimant did not meet it. He articulated clear support from the objective medical evidence for his conclusion, and correctly emphasized that it does not bode well for Claimant's position that no treating or examining physician identified findings equivalent in severity to the criteria of any listed impairment, nor did the state agency medical and mental health consultants opine a listing level

12

condition. *Knox v. Astrue*, 327 F. App'x 652, 655 (7th Cir. 2009). Although Claimant now argues he does in fact meet listing 1.02B, he does no more than cherry-pick medical findings from the evidence of record and make blanket assertions that he satisfies the listing. This does not satisfy Claimant's burden at step three, *Sullivan v. Zebley,* 493 U.S. 521, 531 (1990), nor does it provide the Court any meaningful avenue to disturb the ALJ's finding now.

Claimant's assertion that the ALJ should have specifically considered listing 1.08 is also without merit. As with listing 1.02B, Claimant simply has not met his burden to show how his impairments satisfy the criteria specified in listing 1.08. Listing 1.08 requires a soft tissue injury "under continuing surgical management" that is ultimately unsuccessful in restoring "major function" in the involved body part within one year. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 1.08. Whether or not a soft tissue injury exists here, Claimant presents no medical evidence beyond his own testimony and subjective symptom reports that he was "under continuing surgical management," let alone that "major function" of his right wrist or hand was not restored. *Curvin v. Colvin,* 778 F.3d 645, 650 (7th Cir. 2015) (at step three, the ALJ cannot substitute a claimant's allegations of pain or other symptoms for a missing or deficient sign or laboratory finding, such as objective medical evidence, to raise the severity of an impairment to that of a listed impairment) (citing 20 C.F.R. § 404.1529(d)(3)). Certainly the fact that he was discharged from occupational therapy in 2012 and recommended to continue with only home exercise to resolve his symptoms is probative of the fact that Claimant was neither under "continuing surgical management" nor without "major function" of his right wrist. Again, it is Claimant's burden now – as it was at the hearing – to bring forward something more than conclusory statements that "major function of the right wrist was never restored after at least 4 surgeries" as evidence that "listing severity is met at sections 1.08 and 1.02 B separately as well as equaling listing severity cumulatively." [ECF No.

17] at 8. Because Claimant has not done so or demonstrated specifically how he meets or medically equals listing 1.08, the Court will not overturn the ALJ's reasoned conclusion that Claimant's impairments, considered both individually and in combination, did not meet the criteria of any listed impairment.

Claimant concludes his step three argument by asserting that the ALJ should have called an independent medical expert to review the evidence in this case because the record was incomplete. According to the Claimant, the state agency consultants formulated their opinions prior to his DeQuervain's surgeries in 2011 and therefore cannot have considered them as part of their opinions. If they had considered them, Claimant believes their opinions would necessarily have changed and they would have agreed he suffered more extreme limitations. Although the ALJ does have a duty to develop a develop a full and fair record, *Nelms v. Astrue,* 553 F.3d 1093, 1098 (7th Cir. 2009), it is Claimant's burden, not the ALJ's, to prove he is disabled. *Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017) (citing *Meredith v. Bowen,* 833 F.2d 650, 655 (7th Cir. 1987); 20 C.F.R. § 404.1512(a)(1)). Particularly where the Claimant was represented by counsel during the proceeding, as here, courts give "deference to an ALJ's decision about how much evidence is sufficient to develop the record fully and what measures (including additional consultative examinations) are needed in order to accomplish that goal." *Poyck v. Astrue*, 414 F. App'x 859, 861 (7th Cir. 2011) (citing *Nelms*, 553 F.3d at 1098; *Kendrick v. Shalala,* 998 F.2d 455, 458 (7th Cir. 1993)); *see also, Glenn v. Sec'y of Health and Human Servs.,* 814 F.2d 387, 391 (7th Cir. 1987) ("The ALJ is entitled to assume that a claimant represented by counsel 'is making his strongest case for benefits.'").

Here, Claimant, through his counsel, knew that both state agency consultants opined that Claimant was disabled at the time of Claimant's hearing. He also knew that they had formulated

that opinion prior to Claimant's DeQuervain's surgeries in 2011 and therefore cannot have considered them. But Claimant never presented an opinion on medical equivalence from those who treated him, nor did he ask the ALJ to recontact the state-agency consultants for an updated opinion – even though he was contemporaneously gathering other evidence for the record, including treatment notes from the very surgeries at issue here. As the Seventh Circuit has emphasized, the "appropriate inference" to be drawn in this circumstance is that Claimant "decided that another expert opinion would not help [him]" and chose not to take steps to fill in the gaps he now asserts require remand. *Buckhanon ex rel. J.H. v. Astrue,* 368 F. App'x 674, 679 (7th Cir. 2010).

Based on the evidence before the Court, the ALJ therefore did not abuse his discretion when he determined that it was not necessary to follow-up with Claimant's treating physicians, recontact the state agency consultants, or request additional consultative examinations. The ALJ had the benefit of several years of detailed treatment notes from Claimant's physicians and other medical contacts, including fulsome evaluations by orthopedic surgeons and other specialists, when he made his listing level determinations and formulated Claimant's RFC. He expressly relied upon the medical judgment of the state-agency consultants, and their uncontradicted opinions constitute substantial evidence, especially where the record contains no contradictory treatment or medical source. *Scheck v. Barnhart,* 357 F.3d 697, 700-01 (7th Cir. 2004). The ALJ was therefore entitled to conclude that the evidence in the record was sufficient for him to render a full and fair opinion and craft an RFC tailored to Claimant's particular limitations, and any putative error in not doing so was harmless. *See Luna v. Shalala,* 22 F.3d 687, 692-93 (7th Cir. 1994) (citing *Kendrick v. Shalala*, 998 F.2d 455, 456-57 (7th Cir. 1993) ("…how much evidence to gather is a subject on which we generally respect the Secretary's reasoned judgment.").

## II.     The ALJ's Credibility Assessment was not Patently Wrong

After careful consideration of the record evidence, the ALJ concluded Claimant's subjective symptom allegations were "not entirely credible" because the extensive functional limitations and limited activities Claimant described were inconsistent with the medical evidence, treatment record with gaps in treatment, and objective clinical exam findings. (R. 536). Claimant characterizes this credibility determination as "erroneous" and insists that remand is required. [ECF No. 17] at 10-13. This Court disagrees and finds for the reasons below that the ALJ was not patently wrong in his assessment of Claimant's subjective symptom statements.

An ALJ's evaluation of a claimant's subjective symptom statements will be upheld unless it is "patently wrong." *Burmester v. Berryhill,* 920 F.3d 507, 510 (7th Cir. 2019); *Murphy v. Colvin,* 759 F.3d 811, 816 (7th Cir. 2014) (patently wrong "means that the decision lacks any explanation or support."). "SSR 96–7p provides a two-step test for adjudicators to follow when evaluating a claimant's symptoms such as pain." *Maske v. Astrue,* 2012 WL 1988442, at *11 (N.D. Ill. 2010). First, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)…that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96–7p., 61 Fed. Reg. at 34484. Second, if there is such an impairment, "the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." *Id.* at 34485. The ALJ must justify his or her subjective symptom evaluation with "specific reasons supported by the record," *Pepper v. Colvin,* 712 F.3d 351, 367 (7th Cir. 2013), and in doing so, must consider several factors, including the objective medical evidence, the claimant's daily activities, his level of pain or symptoms, aggravating factors,

medication, course of treatment, and functional limitations. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at *5, *7-8 (Oct. 25, 2017).

Claimant testified that he was, essentially, completely disabled as a result of physical limitations and accompanying pain in three areas: abdominal pain, right wrist and hand pain, and bilateral shoulder pain.[8] The ALJ summarized Claimant's subjective symptom testimony as follows:

> "The claimant testified that he has not worked since August of 2008…The claimant testified that he mainly stays at home and naps three to four times daily for 1 to 3 hours. He testified to significant limitations that allegedly interfere with his ability to do any extensive standing, sitting, physical maneuvers such as bending and stooping. He alleged extensive limitation with his hands that he cannot hold onto things and he needs help getting dressed. However, he testified that his wife works full time; therefore, she is not always at home. Nevertheless, he testified that she does all of the household chores and shopping. Essentially, the claimant testified that he does not do really anything other than watch some television. He testified that he does not go to his children's activities. He basically testified that he relies on his wife and children." (R. 536).

Some of Claimant's subjective symptom reports are also contained in the medical records in the form of self-reports to physicians during the relevant period. During a physical consultative examination in 2011, "[i]n addition to complaints of abdominal pain, [Claimant] complained of right wrist pain from a prior history of right wrist surgery in 2009 (for historical purposes only this surgery is documented in Exhibit 1F). He complained of residual pain, tingling and numbness from this right wrist impairment. He complained of bilateral shoulder pain right worse than left with

---

[8] Claimant also alleged bilateral knee pain, but only in passing at his 2011 consultative examination and during two routine check-ups with his primary care physician in 2013. (R. 356, 786-88, 871). Despite these complaints, he does not appear to have needed or received treatment for this knee pain during the relevant period, nor does he appear to allege any significant limitation a result of it. And during the aforementioned check-ups, the medical evidence showed no findings of fracture, dislocation, joint effusion, or osteochondral injury and only mild degenerative changes – which the ALJ himself took into account as one of Claimant's non-severe limitations. (R. 533-35, 871). Claimant did not emphasize his knee pain at the hearing and does not mention it in his written filings now before this Court. For this reason, the Court acknowledges Claimant's sporadic complaints of knee pain – as did the ALJ – but will not place outsized importance on it in the context of Claimant's subjective symptom statements.

problems lifting above head (Exhibit 3F/4). He complained of bilateral knee pain." (R. 537). Finally, in 2012, Claimant had a medical follow-up at which he also complained of right-hand wrist pain that had progressively worsened over the past six months. (R. 539).

There is no presumption of truthfulness for a claimant's subjective complaints. An ALJ is entitled to rely – as the ALJ did here – on medical opinions based on objective observations as one factor in evaluating the veracity of a claimant's statements. *Rice,* 384 F.3d at 371. Indeed, the ALJ in this case emphasized that his credibility determination was heavily based on his review of the objective medical evidence, which he ultimately concluded did not corroborate Claimant's subjective symptom statements. SSR 16-3p, 2017 WL 5180304, at *5 ("[O]bjective medical evidence is one of the many factors we must consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms."). Because there were no treating source opinions available in this case, the ALJ relied upon the reports and notes from treating and consulting medical sources and opinions of the state agency consultants as relevant objective medical evidence and he carefully evaluated Claimant's abdominal pain, right wrist and hand pain, and bilateral shoulder pain.

Turning first to whether Claimant's abdominal pain was consistent with the objective medical evidence, the ALJ noted that although the ALJ had a history of multiple hernias in his abdomen that required surgical intervention, this history was remote, with the surgeries having occurred in the 1990s more than 20 years before the hearing in this case and well before Claimant's alleged onset date. (R. 355, 536). But Claimant neither received ongoing treatment, nor did he have "ongoing presentations," for abdominal pain during the relevant period. (R. 536-37). Furthermore, when Claimant was examined by Dr. Panjal Shah at the request of the state agency

in 2011, Dr. Shah's objective observations of Claimant seemed to bely the extreme limitations Claimant repeatedly testified to. As the ALJ explained regarding Claimant's abdominal pain:

> "Notably, Dr. Shah observed the claimant to be sitting up on the exam table in no apparent distress. I find this notable since the claimant and his wife…alleged that he cannot even dress without help, barely goes out and he needs help to go out of the house (Exhibits 4E; 8E; 3F/3). These excessive limitations are inconsistent with the claimant in no apparent distress…He had mild diffuse tenderness of the abdomen scars from previous surgeries. However, there was no guarding or rebound tenderness present…The claimant was able to walk with a normal gait for 50 feet without any cane, crutch or other assistive devices. Deep tendon reflexes are 2+ in all four extremities. He had no muscle atrophy. I find his lack of muscle atrophy and his normal strength other than the right wrist undermines his allegations of extreme inactivity, lying down most of the day with three to four naps…" (R. 537).

A month after his consultative examination with Dr. Shah, on March 14, 2011, Claimant saw his primary care physician, Dr. Lynn Koehler, M.D., complaining of right hand and right shoulder pain. (R. 375-76). He did not complain of abdominal pain during that appointment, though he did report numbness in his fingertips, right shoulder pain, a small painful bump on his right lower forearm, and heartburn. (R. 375-76). Nor did he report any ongoing abdominal pain during follow-up appointments with an orthopedic surgeon, Dr. Fakhouri, on March 24, 2011, April 25, 2011, June 14, 2011, June 27, 2011, September 12, 2011, or June 18, 2012. (R. 390, 392-93, 439-440, 441-443). Further, during occupational therapy appointments for his right hand and wrist between August and October of 2012, Claimant never reported any limitations as a result of ongoing abdominal pain. (R. 829-59). Towards the end of the relevant period, on February 26, 2013, Claimant did describe "some abdominal pain on [right] side from prior surgeries" at a check-up with his primary care physician, but was prescribed only a refill of his regular pain medication to address those symptoms. (R. 788).

With respect to Claimant's right wrist and hand pain, the ALJ made an extensive record of the objective medical evidence that he believed was inconsistent with the extensive limitations

Claimant asserted. Dr. Shah's objective observations during his 2011 examination revealed that Claimant had reduced strength and range of motion in his right wrist; in particular, reduced grip strength in his right wrist of about 2 to 3 out of 5. (R. 537). However, despite these reductions in wrist strength mobility, Dr. Shah observed that Claimant's "fine and gross manipulative movements of hands and fingers only showed mild difficulty in some activities such as tying shoes, picking up pen and open door using knob." (R. 537). Claimant did not exhibit any difficulty with buttons or zipper, and his examination showed only a "mild degree of weakness in the right dominant hand and mild pinch strength assessment." (R. 537).[9]

Even more compelling to the ALJ was the improvement Claimant saw to his right wrist and hand after both surgical and non-surgical treatment in 2011 and 2012. Claimant visited his primary care physician after Dr. Shah's examination, as referenced above, and was referred to Dr. Fakhouri to specifically address the pain he was alleging to his right extremities. (R. 538). It had been over a year since Claimant sought treatment with Dr. Fakhouri for pain management or right extremity complaints. (R. 538). Dr. Fakhouri examined Claimant on March 24, 2011, and after some follow-up visits related to Claimant's shoulder pain, Dr. Fakhouri performed a DeQuervain's release and right carpal tunnel release on June 14, 2011 to address Claimant's wrist and hand pain. (R. 538). Claimant followed up with Dr. Fakhouri on June 27, 2011 and on September 12, 2011, at which time he was experiencing no tenderness and good range of motion. (R. 449). Although he was recommended to continue therapy to gradually strengthen his comparatively weak right extremity, there is no record evidence that he did so. (R. 449).

Nine months later – and more than a year after his DeQuervain's release – Claimant followed up with Dr. Fakhouri because of right hand wrist pain he said had progressively worsened

---

[9] "[Claimant's] left grip strength was 5/5." (R. 537).

20

over the past six months. X-rays of Claimant's wrist on June 18, 2012 confirmed severe flexor tenosynovitis of the right middle finger, ring finger and small finger, and that Claimant had DeQuervain's tenosynovitis of the right wrist and FCU tendinitis. (R. 539). Dr. Fakhouri immediately addressed Claimant's symptoms with a cortisone injection, and within two months, Dr. Fakhouri performed another DeQuervain's release, this time of Claimant's 1st dorsal compartment of the right wrist, as well as stenosing flexor tenosynovitis of the right middle finger, right finger, and right small finger. (R. 539). After surgery, Claimant was again referred to – and this time participated in – occupational therapy. Claimant improved with therapy and his treatment notes show that his prognosis was good. (R. 539). For example, at a reassessment on September 17, 2012, Claimant had significant improvements in wrist flexion and extension, wrist and finger strength, his pain reports (3-4/10 at the start of therapy and 4-5/10 following therapy), and the hypersensitivity in his fingertips. (R. 837-38). On October 23, 2012, Claimant was again reassessed and showed further improvement in wrist flexion, strength (including right grip strength), and in fingertip sensation. (R. 844). He also reported functional improvements, with some residual limitations, in tasks such as writing, opening containers, and lifting and carrying items. (R. 844-45). He was discharged from therapy on October 30, 2012 after attending ten sessions and having six cancellations or no shows, and it was recommended that he pursue a home exercise program for continued symptom and functionality improvement. (R. 529, 538).

Between the date of his discharge from therapy and his date last insured of December 31, 2013, there are only two notes in the record indicating that Claimant sought treatment or had a reoccurrence of pain in his right extremity. On May 7, 2013, Claimant complained of elbow pain to his primary care physician. (R. 786) ("Pt presents w/ c/o right elbow pain, decrease in strength…C/o right elbow pain for a month. Hurts to lift a gallon of milk. Pt. is right-handed. Used

to See Dr. Fakhouri for hand/wrist problems."). A few days later, Claimant returned Dr. Fakhouri to address the pain to his right elbow and lateral proximal forearm.[10] (R. 781). He received two cortisone injections and was recommended Tylenol for the pain. (R. 781). Although he was asked to return in four to six weeks, (R. 781), the record does not reflect that he followed up with Dr. Fakhouri after that date, suggesting that the treatment was – just as cortisone injections had been in the past – effective at treating Claimant's symptoms.

As to the third and final category of pain alleged, Claimant's first report of bilateral shoulder pain during the relevant period was during Dr. Shah's 2011 consultative examination. (R. 355-57, 527). Dr. Shah documented Claimant's pain report and some reduced range of motion and tenderness in both shoulders at that time. (R. 356). Claimant specifically described right shoulder pain that was worse than his left and explained that he had problems lifting above his head, which Dr. Shah confirmed. (R. 356). He sought treatment at Midwest Orthopedics for his shoulder pain in April of 2011 and had positive findings for pain at his initial appointment, though no visible or palpable abnormalities. (R. 390). He was still experiencing pain with impingement at his follow-up examination with Dr. Jose Perez-Sauz, M.D., on May 16, 2011, although he had full range of motion at that time and his MRIs did not show a rotator cuff tear on either side. (R. 450). He was diagnosed with a left partial thickness tear, and after discussing treatment options with Dr. Perez-Sauz, Claimant received a subacromial steroid injection and experienced prompt relief, just as he had when he complained of pain in his left shoulder in 2008. (R. 390, 450). He was recommended to participate in therapy, though the record does not show whether he did so. (R. 450).

---

[10] Interestingly, although Claimant testified that he stopped working in 2008 as a result of his disabling limitations, Claimant told Dr. Fakhouri during his examination that he "works in a restaurant" and had been experiencing pain in his elbow and forearm for about two months. (R. 781).

The ALJ properly considered the above objective evidence as one factor in his decision that Claimant's statements concerning the intensity, persistence, and limiting effect of his symptoms were not entirely credible. As the Seventh Circuit has recognized, "discrepancies between the objective evidence and self-reports may suggest symptom exaggeration." *Jones v. Astrue,* 623 F.3d 1155, 1161 (7th Cir. 2010); *see also, Britt v. Berryhill,* 889 F.3d 422, 426 (7th Cir. 2018); *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008); *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir.2005); *Mueller v. Astrue*, 860 F. Supp. 2d 615, 633 (N.D. Ill. 2012). In this case, the ALJ fully explained his decision. He acknowledged Claimant's description of abdomen, wrist, hand, and shoulder pain and accompanying limitations. But he also recounted the objective medical evidence, as described in detail above, suggesting that Claimant could perform light work with additional restrictions to accommodate Claimant's particular limitations. That is, although the evidence showed that Claimant reported some degree of abdominal pain to Dr. Shah in early 2011, Claimant's medical records do not show repeated complains of abdominal pain that would support the assertion that it was a pervasive and limiting issue. Similarly, despite Claimant's complaints, the record demonstrated that Claimant's right wrist and hand symptoms were in fact well-treated by two separate DeQuervains surgeries and occupational therapy. As for Claimant's shoulder pain, he received a steroid injection and experienced prompt relief within a month of first reporting his shoulder pain in April of 2011, indicating that he had good results with the treatment provided and did not have disabling limitations to the extent he alleged at the hearing.

In addition to the objective medical evidence, the ALJ also considered the nature and frequency of Claimant's course of treatment as one factor in evaluating Claimant's credibility. "[I]nfrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment,"

but the ALJ may not draw any inferences "about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care." *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008), citing Social Security Ruling 96–7p. The medical evidence above shows that Claimant had significant gaps in his treatment, which the ALJ found suspect given that Claimant testified he was in constant, unabating pain that rendered him incapable of doing much other than watch TV. Claimant complained of abdomen pain at a consultative examination in 2011 but did not, at least in the record before this Court, seek treatment for it at any time during the relevant period beyond pain medication. Nor did he regularly raise abdominal pain as an acute or ongoing issue at his medical appointments.

Claimant sought treatment for right wrist and hand pain on and off in 2011 and 2012, after which, by all objective medical accounts, his symptoms and functionality improved with surgical and non-surgical treatment or therapy. As with his abdominal pain, the record does not suggest that Claimant sought treatment or followed up with his medical providers after he was discharged from occupational therapy with a good prognosis in October of 2012, aside from two cortisone shots to address elbow and forearm pain in 2013. Finally, with regard to his shoulder pain, the evidence shows that after Claimant's report of bilateral shoulder pain in April of 2011, he does not appear to have raised shoulder complaints or treatment with his physicians after receiving a steroid injection in May of 2011 and experiencing prompt relief of his symptoms at that time.

The ALJ also probed some explanations for infrequent treatment at Claimant's hearing, beginning with the most common reason claimants delay or do not seek treatment for their ongoing symptoms: financial limitations. Claimant testified that he has health insurance through his wife, (R. 566), who is employed as a special education teacher. The ALJ then asked at various points whether Claimant was recommended for further surgery or treatment to address his ongoing

24

complaints of pain, to which Claimant repeatedly responded, in one form or another, that "[t]he reason why I haven't done it is because I've just been through the ringer with all these other surgeries. My body's just like – the medicine and stuff – I mean I'm constantly dry, you know what I mean. Just like – I just – just from all of my medicine and stuff, too…I just – my body – just going through all these other surgeries I've been through." (R. 563); (R. 579) ("That's the reason why I didn't get any other surgeries done because my body's been through so many surgeries already…").

Although the ALJ did not ask Claimant point-blank why he did not follow-up with his physicians about his ongoing pain during the year-long gaps in treatment, there was enough record evidence, both objective and subjective, concerning the reasons Claimant did not seek further treatment for the ALJ to consider the infrequency or severity of Claimant's treatment as one factor in his credibility analysis. *Craft*, 539 F.3d at 679. At the very least, there was evidence in the record about the infrequency of Claimant's treatment (certainly compared to the extreme, disabling pain Claimant now alleges he was experiencing at the time) from which the ALJ reasonably could infer that Claimant was not telling him the truth about his level of pain and his functional capacity during the relevant time period. So too was there ample evidence suggesting that the nature of Claimant's treatment, both surgical and non-surgical, was effective at treating (if not resolving) Claimant's complaints during the relevant period.

The Court acknowledges that a claimant's lack of treatment for alleged health or medical conditions does not ineluctably justify an ALJ discounting the claimant's testimony or a finding that she or he is not credible. *Craft*, 539 F.3d at 679. It may be, for example, that there is no treatment reasonably available to the claimant to address the conditions that purportedly give rise to his or her complaints. *Id.* But that does not appear to be the case here. Claimant obtained

treatment for the medical conditions he raised (except for his one-time complaint of abdominal pain) and he also had the means to do so given that he was covered by his working wife's insurance. The ALJ here was justified in concluding that Claimant's lack of or infrequent treatment during the relevant time period, and the fact that he benefited from the multiple medical interventions and treatment that he did have, undercut the credibility of his subject symptom statements.

At the end of the day, Claimant testified that he was substantially more limited in his activity during the relevant time period than any of his consulting or treating physicians documented. As described in detail above, there is substantial evidence in the record to support the ALJ's conclusion that Claimant was not as disabled during the relevant time period as he portrayed himself to be. Further, and unlike this Court, the ALJ "had the opportunity to observe the claimant testifying, and, as Justice Jackson rightly observed more than a half-century ago, 'a few minutes observation... in the courtroom is more informing than reams of cold record.'" *Brenda L. v. Saul,* 392 F. Supp. 3d 858, 864 (N.D. Ill. 2019) (quoting *Ashcraft v. State of Tenn.,* 322 U.S. 143, 171 (1944) (Jackson, J., dissenting)). Ultimately, the ALJ properly considered the extent to which the objective medical evidence supported the degree of severity of Claimant's subjective complaints; the duration, frequency, and intensity of the pain; medications taken; and treatment. *Scheck*, 357 F.3d at 703 (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). Although Claimant's reported activities of daily living – which painted Claimant as entirely house-bound and unable to do much other than watch TV during the day – supported Claimant's subjective symptom complaints, the ALJ was not wrong to weigh the other factors as he did and conclude that Claimant was exaggerating the nature and extent of his proffered disability. The ALJ was required to explain his subjective symptom evaluation "in such a way that allows [the Court] to determine whether [he] reached [his] decision in a rational manner, logically based on [his] specific

findings and the evidence in the record." *Murphy*, 759 F.3d at 816 (internal quotations omitted). He did so here. The ALJ's analysis is amply supported by the hearing record, and as such, this Court sees no reason to disturb the ALJ's reasonable credibility determination here, particularly given that as a factual finding, credibility determinations are due special deference. *Scheck*, 357 F.3d at 703.

## CONCLUSION

For the reasons discussed above, Claimant's Motion for Summary Judgment [ECF No. 17] is denied, and the Commissioner's Motion [ECF No. 24] is granted.

It is so ordered.

Jeffrey T. Gilbert
United States Magistrate Judge

Dated:   January 11, 2021

27